Receipt number AUSFCC-10655034

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SEIDEN FOODS, INC. ) | |
|     Plaintiff, ) | |
| ) | Case No. **25-1362T** |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
|     Defendant. ) | |

## COMPLAINT

Seiden Foods, Inc. ("Plaintiff") files this Complaint against the United States of America ("Defendant") for a refund of the Employee Retention Credit for third quarter of 2021, and alleges as follows:

## THE PARTIES

1. Seiden Foods, Inc. is a New Jersey corporation with its principal place of business at 8008 Ventnor Ave, Margate City, New Jersey 08402.

2. The United States of America is the proper defendant because this Complaint seeks refund of taxes paid to (and refundable credits owed from) the Internal Revenue Service ("IRS"), a political subdivision of the United States.

3. The Plaintiff has not initiated any other lawsuits in state or federal court dealing with the same or similar facts as this action.

4. A statement required under R.C.F.C. 9(m)(2)(B) is attached as **Exhibit A**.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1491.

## LEGAL BACKGROUND

### Federal Employment Taxes

6. Plaintiff is claiming a refund of Form 941 employment taxes ("Form 941 taxes") and the refundable Employee Retention Credit ("ERC").

7. Employers are required by law to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from their employees' wages, remit these

withholdings, and report them to the IRS on tax Form 941. The portion of Form 941 taxes attributable to the employees' withholdings is often referred to as the "Trust Fund" portion.

8. Employers are also responsible for paying FICA taxes that they owe, often referred to as the "employer portion," and reporting such taxes to the IRS on Form 941. 26 U.S.C §§ 3102 and 3111.

9. Employers are usually obligated to file with the IRS the Form 941 quarterly. 26 U.S.C § 6011; 26 C.F.R. § 31.6071 (a)-1.

## Employee Retention Credit

10. In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. 116-136 (Mar. 27, 2020). Section 2301 of the CARES Act provided for the ERC to be issued to eligible employers on qualified wages paid to their employees. Pub. L. 116-136, § 2301. The ERC program was amended and extended under the Consolidated Appropriations Act of 2021, Pub. L. 116-260, § 206 (Dec. 27, 2020), and the American Rescue Plan Act of 2021, Pub. L. 117-2, § 3134 (Mar. 11, 2021), and terminated under the Infrastructure, Investment and Jobs Act, Pub. L. 117-58, § 80604, (Nov. 15, 2021). *See also* 26 U.S.C. § 3134 (codifying section 2301 of the CARES Act).

11. A business that is an eligible employer that pays qualified wages after March 12, 2020, and through December 31, 2021, is entitled to claim the ERC against its Form 941 taxes on the applicable Form 941 return for that quarter.

12. Under section 2301(b)(3) of the CARES Act, if the amount of the credit exceeds the amount of Form 941 taxes for any applicable quarter, then the excess is treated as an overpayment and refunded to the employer. *See* 26 U.S.C. § 3134(b)(3).

## General Qualifying Requirements

### *Employer Eligibility*

13. An eligible employer is one that carried on a trade or business during calendar years 2020 and 2021 and, with respect to any calendar quarter for which the business experienced one of the following:

   a. Its operations were fully or partially suspended due to orders issued by a governing authority in response to COVID-19 ("Full or Partial Suspension Test") that limited commerce, travel, or group meetings; or
   b. The business experienced a significant decline in gross receipts ("Gross Receipts

Test") for any calendar quarter of 2020 and/or the first three quarters of 2021[1] compared to the corresponding quarter of 2019.

26 U.S.C. § 3134(c)(2).

### *Qualified Wages*

14. For the purposes determining the ERC for quarters in 2020 and 2021, "qualified wages" includes only the wages paid to their employees (as defined by 26 U.S.C. § 3231(c)), but also expenses the employer paid to provide and maintain a group health plan (only to the extent that the amounts are excluded from the gross income of the employees). 26 U.S.C. §§ 3134(c)(3), (c)(5)(A), (c)(5)(B).

15. However, this term is subject to certain additional restrictions: to claim the credit for quarters in 2020, the employer must have averaged no more than 100 employees in 2019. To claim the credit for quarters in 2021, the employer must have averaged no more than 500 employees in 2019. 26 U.S.C. § 3134(c)(3).

### *Calculating the Credit*

16. For quarters in 2020, the employee retention credit is limited to fifty percent (50%) of qualified wages that an eligible employer pays to an employee in a calendar quarter. 26 U.S.C. § 3134(b)(1). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee for the entire calendar year of 2020. 26 U.S.C. § 3134(b)(1).

17. For quarters in 2021, the employee retention credit is limited to seventy percent (70%) of qualified wages that an eligible employer pays in a calendar quarter. 26 U.S.C. § 3431(a). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee *per quarter* in 2021. 26 U.S.C. § 3134(b)(1).

18. Plaintiff, doing business as Casel's Marketplace, operates an independent grocery store in Margate, New Jersey.

19. Plaintiff is fully owned by Howard and Randi Seiden.

20. Plaintiff had on average less than 100 full-time employees during calendar year 2019.

21. Plaintiff paid qualified wages to its employees in calendar years 2020 and 2021.

---

[1] A business may be eligible to receive an ERC for the fourth quarter 2021 if it qualifies as a "recovery startup business." *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III). Plaintiff does not qualify as such and thus does not seek an ERC for this quarter.

22. Plaintiff is not a party to any employee leasing arrangement and did not otherwise lease employees.

23. Plaintiff is not a part of an affiliated service group within the meaning of 26 U.S.C. § 414(m).

## The Relevant Governmental Orders

24. Beginning on March 21, 2020, several orders issued by New Jersey ("Relevant Governmental Orders") significantly limited commerce in ways relevant to Plaintiff:

25. On March 21, 2020, New Jersey Governor Phil Murphy signed Executive Order No. 107, ordering all New Jersey residents to remain at home. Individuals were required to practice social distancing and stay six feet apart whenever practicable. All businesses, including essential ones, were ordered to accommodate their workforce for telework wherever practicable. If telework was not an option, businesses were required to make best efforts to reduce staff on site to ensure that essential operations could continue. This restriction remained in effect through the end of May 2021.

26. On April 9, 2020, Governor Murphy signed Executive Order No. 122. This order allowed essential businesses including grocery stores to continue operating but imposed restrictions. Chiefly, the order required businesses to adopt a policies that, at minimum:

   a. Limit occupancy at 50% of the stated maximum store capacity, if applicable, at one time;
   b. Establish hours of operation, wherever possible, that permit access solely to high-risk individuals, as defined by the Centers for Disease Control and Prevention ("CDC");
   c. Install a physical barrier, such as a shield guard, between customers and cashiers/baggers wherever feasible or otherwise ensure six feet of distance between those individuals, except at the moment of payment and/or exchange of goods;
   d. Require infection control practices, such as regular hand washing, coughing and sneezing etiquette, and proper tissue usage and disposal;
   e. Provide employees break time for repeated handwashing throughout the workday;
   f. Arrange for contactless pay options, pickup, and/or delivery of goods wherever feasible. Such policies shall, wherever possible, consider populations that do not have access to internet service;
   g. Provide sanitization materials, such as hand sanitizer and sanitizing wipes, to staff and customers;
   h. Require frequent sanitization of high-touch areas like restrooms, credit card machines, keypads, counters and shopping carts;
   i. Place conspicuous signage at entrances and throughout the store, if applicable,

      alerting staff and customers to the required six feet of physical distance;

j. Demarcate six feet of spacing in check-out lines to demonstrate appropriate spacing for social distancing; and

k. Require workers and customers to wear cloth face coverings while on the premises, except where doing so would inhibit that individual's health or where the individual is under two years of age, and require workers to wear gloves when in contact with customers or goods. Businesses must provide, at their expense, such face coverings and gloves for their employees. If a customer refuses to wear a cloth face covering for non-medical reasons and if such covering cannot be provided to the individual by the business at the point of entry, then the business must decline entry to the individual, unless the business is providing medication, medical supplies, or food, in which case the business policy should provide alternate methods of pickup and/or delivery of such goods. Nothing in the stated policy should prevent workers or customers from wearing a surgical-grade mask or other more protective face covering if the individual is already in possession of such equipment, or if the business is otherwise required to provide such worker with more protective equipment due to the nature of the work involved. Where an individual declines to wear a face covering on store premises due to a medical condition that inhibits such usage, neither the essential retail business nor its staff shall require the individual to produce medical documentation verifying the stated condition.

Exec. Order No. 122, at 5–7.

27.    Additionally, Executive Order No. 122 ordered essential businesses to implement policies that:

a. Immediately separate and send home workers who appear to have symptoms consistent with COVID-19 illness upon arrival at work or who become sick during the day;

b. Promptly notify workers of any known exposure to COVID-19 at the worksite, consistent with the confidentiality requirements of the Americans with Disabilities Act and any other applicable laws;

c. Clean and disinfect the worksite in accordance with CDC guidelines when a worker at the site has been diagnosed with COVID-19 illness; and

d. Continue to follow guidelines and directives issued by the New Jersey Department of Health, the CDC and the Occupational Health and Safety Administration, as applicable, for maintaining a clean, safe and healthy work environment.

Exec. Order No. 122, at 11.

28.    On October 28, 2020, Governor Murphy signed Executive Order No. 192, instituting safety mandates for employers. The order required every business with a physically

present workforce to:

    a. Require that individuals at the worksite maintain at least six feet of distance from one another to the maximum extent possible;
    b. Require employees, customers, visitors, and other individuals entering the worksite to wear cloth or disposable face masks while on the premises, in accordance with CDC recommendations;
    c. Provide sanitization materials, such as hand sanitizer and sanitizing wipes to employees, customers, and visitors at no cost to those individuals;
    d. Routinely clean and disinfect all high-touch areas in accordance with Department of Health and CDC guidelines;
    e. Conduct daily health checks of employees, such as temperature screenings, visual symptom checking, self-assessment checklists, and/or health questionnaires, consistent with CDC guidance;
    f. Immediately separate and send home employees who appear to have symptoms consistent with COVID-19 illness;
    g. Promptly notify all employees of any known exposure to COVID-19 at the worksite.

Exec. Order No. 192, at 4–9.

29. On May 21, 2021, Executive Order No. 239 eased indoor capacity restrictions across most indoor businesses. However, it required these businesses to "limit occupancy to a number that ensures all patrons or groups of patrons entering the facility together can remain six feet apart." *See* Exec. Order No. 239, at 8.

30. On June 4, 2021, Executive Order No. 244 ended the Public Health Emergency and terminated the requirements imposed on employers in Executive Order 192.

31. On July 27, 2021, the CDC issued new guidance given the rise of the COVID-19 Delta variant across the country. The CDC guidelines recommended that *all* individuals wear masks indoors. While the CDC styled the recommendations as guidance, Governor Murphy's Executive Order No. 122 mandated that essential businesses, including grocery stores, follow guidelines issued by the agency.

### **Plaintiff's Operations Were Impacted by The Relevant Governmental Orders**

32. To comply with the Relevant Governmental Orders, Plaintiff experienced significant interruptions and hindrances to its business.

33. As a grocery store, Plaintiff was allowed to remain open during the pandemic. Accordingly, Plaintiff was unable to transition any meaningful portion of its employees to remote work because employees needed to be on the premises to fill stock, complete customer transactions, and conduct other basic operations on the premises.

34. However, the capacity restrictions imposed by the Relevant Governmental Orders impacted Plaintiff's ability to operate at a capacity comparable to pre-pandemic levels—Plaintiff had to limit the number of customers in the store, continuously monitor their presence in the store to confirm compliance with social distancing requirements, and keep incoming customers out of the store until capacity in the store sufficiently diminished.

35. Plaintiff also had to expend significant resources to comply with the Relevant Governmental Orders' physical barriers, cleaning, sanitizing, social distancing, and other transmission mitigation requirements.

36. While some of the Relevant Governmental Orders lifted before the end of the third quarter of 2021, the lingering effects of these Relevant Governmental Orders (and the others that remained in place) restricted Plaintiff even beyond each order listed. This was particularly true for the Relevant Governmental Orders requiring Plaintiff to implement significant changes to its operating policies because Plaintiff could not transition away from these policies overnight.

37. The restrictions imposed by the Relevant Governmental Orders affected a significant portion of Plaintiff's business lines for the quarters ended June 30, 2020, through September 30, 2021, creating a more than ten percent (10%) reduction in operational capacity for its business.

38. Accordingly, these facts and circumstances show that the Relevant Governmental Orders had a more than nominal impact on Plaintiff's business and thus caused a partial suspension of its business operations.

39. As a result of this more than nominal impact to its business operations, Plaintiff filed Forms 941-X claiming entitlement to ERCs based on qualified wages:

| Quarter Ended | Qualified Wages | ERC (Excluding Interest) |
|---|---|---|
| June 30, 2020 | $105,161.37 | $52,580.69 |
| September 30, 2020 | $396,648.34 | $198,324.17 |
| December 31, 2020 | $136,879.24 | $68,439.62 |
| March 31, 2021 | $321,760.22 | $225,232.15 |
| June 30, 2021 | $350,597.86 | $245,418.50 |
| September 30, 2021 | $459,902.00 | $321,931.40 |
| **Total ERC Claimed (Excluding Interest)** | | **$1,111,926.53** |

40. While Plaintiff applied for and had forgiven a loan under the first draw of the Paycheck Protection Program, Plaintiff did not take into account wages covered by forgiven PPP loans in its calculation of qualified wages for claiming the ERC.

41. When calculating its ERC, Plaintiff did not take into account wages paid to any individuals who directly or indirectly own a majority in Plaintiff, or wages paid to any relatives of

those individuals.

42. Prior to filing this complaint, Plaintiff received overpayments from the IRS for the quarters ended June 30, 2020, through June 30, 2021.

43. Despite more than six months having passed since Plaintiff filed these claims, the IRS has yet to refund Plaintiff for quarter ended September 30, 2021.

## **COUNT I: PLAINTIFF IS ENTITLED TO A REFUND FOR Q3 2021**

44. On or before October 31, 2021, Plaintiff filed an original Form 941 for the employment tax quarter ended September 30, 2021 ("Q3 2021").

45. Plaintiff has no outstanding employment tax liability for Q3 2021.

46. Plaintiff paid qualifying wages of $459,902.00 in Q3 2021 and calculated an ERC of $321,931.40 for the quarter.

47. On or about January 18, 2023, Plaintiff filed a Form 941-X for Q3 2021, claiming a refund of taxes and ERC in the amount of $321,931.40 plus interest, with the IRS Service Center in Cincinnati, OH. Attached as **Exhibit C** is a true and correct copy of Plaintiff's filed Form 941-X for Q3 2021.

48. The IRS Form 941 Account Transcript, which provides a detailed record of transactions (including filings, assessments, and refunds), for Q3 2021 confirms the IRS received the amended Form 941-X on February 16, 2023. Attached as **Exhibit B** is true and correct copy of the IRS Form 941 Account Transcript for Q3 2021.

49. Plaintiff is a qualified employer eligible for an ERC for Q3 2021 under the Full or Partial Suspension Test because it paid qualified wages to employees and the Relevant Governmental Orders had more than a nominal impact on Plaintiff's operations, leading to a partial suspension of its business operations.

50. Plaintiff timely filed its Q3 2021 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

51. More than six months have elapsed since the Plaintiff filed its Q3 2021 refund claim with the IRS, and the IRS has not disallowed or otherwise adjudicated Plaintiff's claim.

52. Thus, Plaintiff is entitled to a refund of $321,931.40 plus interest for Q3 2021.

WHEREFORE, Plaintiff prays that this Honorable Court:

    A. Award judgment in favor of Plaintiff and against the United States for:

        i. $321,931.40, plus interest, for the quarter ended September 30, 2021; and

        ii. Any other interest, costs and attorney's fees.

    B. Grant any further relief this Court may find just and proper.

Dated: August 14, 2025.                                         Respectfully submitted,

                                                                */s/ Christina Tallulah Lanier*
                                                                CHRISTINA TALLULAH LANIER
                                                                D.C. Bar No. 1779680

                                                                *On Behalf Of*:
                                                                BROTMAN LAW
                                                               402 West Broadway, Suite 800
                                                               San Diego, CA 92101
                                                               Main Office: (619) 378-3138
                                                               Facsimile: (619) 378-3039
                                                               Email: tlanier@sambrotman.com